**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DEC 1 2 2013

Clerk, U.S. District Court
By_____ Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Case No. 13-MJ-8318-01/02-JPO |
| | ) |
| WEIQIANG ZHANG | ) |
|               and | ) |
| WENGUI YAN, | ) |
| | ) |
| Defendants. | ) |
| | ) |

CRIMINAL COMPLAINT

I, Special Agent Charles W. Campbell, the undersigned complainant being duly sworn,

state the following is true and correct to the best of my knowledge and belief.

Beginning on or about October 17, 2010, the exact date being unknown, and continuing

to on or about December 11, 2013, both dates being approximate and inclusive, in the District of

Kansas and elsewhere, the defendants,

WEIQIANG ZHANG
and
WENGUI YAN,

knowingly conspired and agreed together, with each other, and with other persons, known and

unknown to me, with intent to convert a trade secret related to and included in a product for and

placed in interstate and foreign commerce, that being, Company A's methods of developing,

propagating, growing, cultivating, harvesting, cleaning, and storing particular agriculture seeds

for cost-effectively producing recombinant proteins from such seeds, and with intent to steal such

trade secrets to the economic benefit of parties other than Company A, and intending and knowing these actions would injure Company A.

In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the defendants or conspirators, both charged and uncharged, committed, among others, the following overt acts in the District of Kansas and elsewhere.

- On or about October 17, 2010, defendant Weiqiang Zhang drafted a letter to an agricultural university expressing his desire to use his knowledge and expertise of developing recombinant proteins in a particular agricultural seed to the benefit of this institution, and not Company A, where he was employed.

- In or about August 2012, defendants Zhang and Yan traveled at the same time to China and visited specific individuals at a Crop Research Institute.

- In or about October 2012, defendant Zhang, without authorization from Company A, harvested agricultural seeds grown by Company A in Kansas, and stored them at his residence in Kansas.

- In or about November 2012, defendant Wengui Yan wrote a report detailing his work accomplishments that would accelerate agricultural science in his homeland.

- Sometime from July 16-August 7, 2013, agricultural seeds that had recombinant proteins produced solely by Company A were delivered to visitors in the United States for their use in another country, such seeds having been stolen from Company A in Kansas.

- On or about August 7, 2013, personnel with U.S. Customs and Border Protection

discovered the stolen agricultural seeds as these visitors to the United States were departing for their home country.

- From in or about October 2012 until on or about December 11, 2013, defendant Zhang stored hundreds of Company A agricultural seeds at his residence in Kansas, without authorization from Company A.

This was all in violation of Title 18, United States Code, Section 1832(a)(5).


1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Kansas City, Missouri field office.  I have been employed as a Special Agent with the FBI for approximately six years.  I have attended training for obtaining evidence via subpoena and search warrants.  I have participated in investigations involving wire fraud, mail fraud, trafficking in counterfeit goods, drug investigations, computer intrusions, theft of intellectual property, and theft of trade secrets.  I have been involved in various types of electronic surveillance, physical surveillance, and conducted debriefings and interviews of witnesses, victims, and subjects of crimes.  Prior to my employment with the FBI, I was a Special Agent for the Air Force Office of Special Investigations for seven years.  This complaint is based on the following facts, which are known to me as a result of my personal participation in this investigation, my review of pertinent documents, and my discussions with and review of reports, translations, and other documents prepared by other law enforcement officers and translators involved in the investigation.  Because this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of an Arrest Warrant, I have not included each and every fact known to me concerning this investigation.

**Victim**

2.      Company A is a privately held biopharmaceutical company.  Its mission is to

enable global access to life-saving recombinant medicines and other biotechnology products

through its innovative, cost-effective technology platform.  Company A has an extensive

intellectual property portfolio of more than 100 issued and pending patents, and exclusive

licenses to issued patents.  These patents provide long-term sustainable advantage to Company

A's manufacturing technology and product portfolio.  Company A has a production facility in

Junction City, Kansas.

3.      I have interviewed the President and Chief Executive Officer of Company A, who

explained that Company A develops and produces particular agricultural seeds, which have been

designed to express proteins used in the medical and pharmaceutical fields.  Company A is the

only producer of these particular agricultural seeds in the United States.  One of these agricultural

seeds make a recombinant protein that is being developed for use as a therapeutic excipient,

which is an ingredient that is intentionally added to a drug for purposes other than the therapeutic

or diagnostic effect of the intended dosage.  The other agricultural seed makes a different

recombinant protein that is being developed to treat or prevent gastrointestinal disease, antibiotic

associated diarrhea, hepatic disease, osteoporosis, and inflammatory bowel disease.  Company

A's current investment in the technology that enabled these products is approximately $75

million.  If this technology was compromised or the seeds were stolen, Company A believes its

entire research and development investment would be compromised.  The research investment to

generate the seeds themselves is approximately between $3 million to $18 million, and the

4

estimate of lost profits from commercializing these products in global markets is substantially

larger.  Because of this inherent value, the seeds are not authorized to be sent to other companies

or research entities, and Company A considers the seeds to be proprietary information and a trade

secret, critical to the company's economic viability.  The process for making these two particular

seeds is patented; however, the research and protocols used for making the products cost-

effectively is proprietary information and considered as a trade secret to Company A.  These

protocols include developing, propagating, growing, cultivating, harvesting, cleaning, and storing

the seeds, as well as using particular agricultural seed varieties and genetic sequences.

4.     According to the President and Chief Executive Officer, the facility in Kansas

stores both master seed banks and developmental seed banks in accord with Food and Drug

Administration regulations.  Master seeds are stored in segregated lots, in sealed plastic bags in a

temperature controlled environment to maintain seed quality.  Developmental seed lines are also

stored in a temperature controlled environment, but are not sealed like the master seeds, so they

are subject to weight fluctuation, depending on humidity.  The cooler and production area in the

Kansas facility is only accessible via a locked door, which is controlled by a magnetic card

reader.

5.     According to the President and Chief Executive Officer, in July 2013

approximately six Company A employees had magnetic card reader access to the temperature

controlled environment in Kansas where the master and developmental seeds were stored and

secured, and would have known the differences as well as the locations of the particular seeds

with the recombinant proteins.  Two of those employees did not regularly work at the facility in

5

Kansas, but one of those employees was defendant Zhang.

6.     Because Company A considers the protocols associated with making recombinant proteins in these agriculture seeds to be proprietary information, it takes steps to protect that information.  For instance, Company A has agreements with its employees to protect the confidentiality of its proprietary information and trade secrets.  All Company A employees sign an "Acceptance of Employment Offer" and an "Acknowledgement of Receipt and Review of Employee Assignment Agreement" once employment commences.  Part of the Assignment Agreement states the "Employee hereby does irrevocably and unconditionally transfer, assign, pledge and convey to [Company A] any and all of the right, title and interest of employee in and to each of the following:  Any and all of the notes, data and records of any and all experiments (including reasons therefore, and results thereof), inventions, discoveries, improvements, apparatus, processes, compounds, microbial strains, tissue culture lines, plants, plasmids, nucleotide sequences, pieces of DNA, genetic control elements, formulae, patents, copyrights, trademarks, client lists, customer lists, prospective client or customer lists observed, made, performed, discovered or secured by solely or jointly with others, or otherwise, relating generally to any matter connected to the work or tests carried on by [Company A], for which employee had knowledge of any type, whether or not at the request or suggestion of [Company A], at any time after termination of employee from [Company A] employment."

7.     Company A employees also sign an "Acknowledgement of Receipt and Review of Employee Nondisclosure Agreement."  Part of the Nondisclosure Agreement states, "Before or During Employment:  Without the prior written consent of the President of [Company A],

employee will not disclose in any manner, to any person or entity, any or all of the notes, data and records of any and all experiments (including reasons therefore, and results thereof), inventions, discoveries, improvements, apparatus, processes, compounds, microbial strains, tissue culture lines, plants, plasmids, nucleotide sequences, pieces of DNA, genetic control elements, formulae, patents, copyrights, trademarks, client lists, customer lists, prospective client or customer lists, or any other intangible rights, observed, made, performed, discovered or secured by employee, or other employees or employees of [Company A], solely or jointly with others, or otherwise, at any time after the effective date of the [Company A] Employment Offer, and before termination of employment with [Company A]."

8.      Company A employees also sign an "Acceptance of Employment Offer" which states in part, "Further, I agree that this document, in conjunction with the [Company A] Employment Handbook, Employee Nondisclosure Agreement and Employee Assignment Agreement, executed by me, sets forth the terms and conditions of my employment with [Company A]." Page 16 of the Employee Handbook states in part, "All information created, sent, received, or stored on the company's electronic resources is company property. Such information is not the private property of any employee and employees should have no expectation of privacy in the use or contents of the company's electronic resources. Passwords do not confer any right of privacy upon any employee of the company. Employees should understand that the company may monitor the usage of its electronic resources and may access, review and disclose information stored on its electronic resources, including messages, personal e-mail communications sent and received on the employer's computers but using private e-mail

7

accounts and other data, at any time, with or without advance notice to the user or the user's consent.  In order to ensure that the usage of such company-provided materials remains ethical and lawful, employees must abide by the following guidelines:

- All business equipment, electronic and telephone communications systems, and all communications and stored information transmitted, received, or contained in the company's electronic resources are the company's property and are to be used for job-related purposes.

- Employees may not download or otherwise import programs, files or documents into the company's computer equipment except as authorized by the company.

- Use of portable drives to download company information for any purpose other than company business is prohibited without the advance written approval by the company's management.

- The company may monitor use of any systems and equipment for any reason.

- The employee in whose name an account is issued by the company is responsible for its proper use at all times.

- The company reserves the right to determine the appropriate use of its electronic resources and its decision is final.

- Employees may not, without authorization, transmit, retrieve or store company information of any kind on their personal email systems.

8

- Unless otherwise allowed by law, company information, whether in electronic or hard-copy form, may only be accessed and used by employees as required to perform job duties, and employees may not access or use company information for any other purpose."

**Defendants**

9.     Defendant Weiqiang Zhang is a citizen of the People's Republic of China, who is currently in the United States as a lawful permanent resident.  In or about 1992, he received a master's degree in agriculture in China, where he worked for several years at a Crop Research Institute in the development and production of rice.  In or about 2000, he began research at Kansas State University in the application of biotechnology in crop production, followed by pursuit of a doctoral degree at Louisiana State University in rice genetics and breeding, which was awarded in or about 2005.  In 2008, he began his employment as an agricultural seed breeder at Company A.

10.     On or about August 18, 2008, defendant Zhang signed the "Acknowledgement of Receipt and Review of Employee Assignment Agreement," the "Acknowledgement of Receipt and Review of Employee Nondisclosure Agreement," and the "Acceptance of Employment Offer" with Company A.  Pursuant to these agreements, defendant Zhang promised to not disclose Company A confidential or proprietary information, which specifically included Company A's methods of developing, propagating, growing, cultivating, harvesting, cleaning, and storing particular agriculture seeds for cost-effectively producing recombinant proteins from such seeds.

9

11.     Defendant Wengui Yan immigrated to the United States from the People's Republic of China as a visiting scientist in or about 1987, and worked at the University of California, Davis.  He received his masters and undergraduate degrees from Sichuan Agricultural University in China.  In or about 1992, he received a PhD in Plant Genetics and Breeding from the University of Arkansas in Fayetteville, while working as a research assistant at the University of Arkansas from 1989-1992.  He then worked as a research associate from 1993-1996 at the University of Arkansas.  Since then, he has been a research geneticist at the USDA Dale Bumpers National Rice Research Center in Stuttgart, Arkansas.  He became a naturalized U.S. citizen on or about November 17, 2000.

**Seed Discovery**

12.     Prior to an outbound flight from the United States to the People's Republic of China on August 7, 2013, United States Customs and Border Protection employees conducted a search of checked and unchecked luggage for a delegation that had traveled to the United States to acquire information about agricultural endeavors in July and August.  The delegation's travels were arranged and handled by defendants Zhang and Yan.  The delegation spent time with both defendants Zhang and Yan.

13.     One member of this delegation from China identified himself on the United States visa application as employed at a crop research institute where he presided over the work.

14.     In one of the checked suitcases, Customs and Border Protection personnel found seven envelopes, each containing approximately seven to thirteen grams of agricultural seeds. Each envelope was labeled with words or initials that correlate with specific types of seed lines.

Also found within the checked suitcase was a plastic Ziploc bag containing one seed and a plastic

case with 12 separate compartments, each containing one agricultural seed that appeared to be

from different types of agricultural products such as soy, rice, wheat, and corn.  The plastic case

was labeled "Agriculture Company B," and had pictures of several agricultural seeds including

soy, rice, wheat, and corn.

15.    In one of the carry-on luggage items for the delegation, Customs and Border

Protection personnel found four envelopes containing agricultural seeds.  Two of the envelopes

contained approximately twenty seeds and were labeled with likely identifiers for the specific

type of seed.  The other two envelopes appeared to be make-shift containers for seeds with one

appearing to be a Best Western Hotel "remote control bag" that would have contained a

"sanitized" remote control in a hotel room, containing approximately forty-six grams of seeds;

and the other from the *Arkansas Democrat Gazette* newspaper page dated July 23, 2013, folded

into the shape of an envelope containing approximately twenty grams of seeds.

16.    A member of the delegation told Customs and Border Protection personnel that he

obtained the seeds from an agricultural research center in Arkansas and from the son a farmer

also visited in Arkansas.  The delegation member explained he was taking the seeds for research

purposes.

17.    Customs and Border Protection personnel also found a thumb drive and camera

memory cards in the possession of the delegation from China, some of which were imaged.

**Identification of Seeds**

18.    An expert rice geneticist employed by the United States Department of

Agriculture reviewed pictures of the envelopes containing the seeds and the labels on the outside

of the envelopes found by Customs and Border Protection personnel. The rice geneticist

recognized the words or initials as rice varieties patented by the University of Arkansas available

for study within the Dale Bumpers National Rice Research Center, as rice varieties protected

under Plant Variety Protection Act certificates owned by Louisiana State University, or as

products of Company A.

19.     During an interview with Company A's President and Chief Executive Officer on

September 6, 2013, he confirmed that Company A is the sole source in the United States of these

two particular types of agricultural seeds. He explained that the quantity of seeds found by

Customs and Border Protection personnel could have been removed from the developmental line

of seeds in the restricted access temperature controlled area in Kansas without detection, due to

fluctuations in weight with changes in humidity because those bags are not kept sealed.

20.     Samples of the seeds detained by Customs and Border Protection suspected as

having been produced by Company A were submitted to a biological diagnostics laboratory in

Wisconsin to identify the seeds. Personnel at Company A then submitted their unique

agricultural seeds to the same biological diagnostics laboratory for comparison. The initial

results of enzyme-linked immunosorbent assay testing (ELISA) of the two different sets of

agricultural seeds were provided on or about November 1, 2013, to the FBI. The results

indicated the presence of one particular protein from 84.48% - 97.45% in the seeds analyzed, and

the presence of the other protein from 66.82% - 85.78% in the other seeds analyzed. In other

words, the tests confirmed the presence of the two unique Company A proteins in the samples

12

found by Customs and Border Protection personnel.

21.     Subsequently, the diagnostics laboratory conducted more extensive analysis of the seeds found by CBP with comparisons to the DNA of the seeds submitted by Company A.  On November 27, 2013, the laboratory provided the agricultural trait testing results to the FBI, which concluded there was a 100% Average Call Rate, meaning 100% of the seeds tested from those found by Customs and Border Protection contained the same unique genetic markers as the known control sample seeds provided by Company A for testing.

**Conspiracy to Steal**

22.     According to the visa applications for the delegation from China that visited the United States from July 16 – August 7, 2013, a professor of agronomy in Kansas served as the U.S. point of contact.  This professor communicated via email with defendant Zhang on defendant Zhang's Company A e-mail account about the delegation's visit, and specifically discussed a tour of Agriculture Company B facilities in Missouri.

23.     Following the interview with Company A's President and Chief Executive Officer in September 2013, he provided emails that defendant Zhang had sent or received through his Company A email account.  Those emails included one dated July 15, 2013, which defendant Zhang sent to a person with Agriculture Company B in Missouri, to confirm defendant Zhang and members of the delegation from China would arrive at the Chesterfield, Missouri, facility on July 18, 2013.  The email string identified the organization involved with the tour as an Academy of Agricultural Science in China.  The email string also included plans for a visit at another Agriculture Company B facility in Creve Coeur, Missouri.

13

24.     On August 23, 2013, Agriculture Company B Global Security Manager provided the FBI with the names and identifying information of the five individuals, who had taken the tours in Creve Coeur and Chesterfield on July 18, 2013.  The first four provided Chinese passports for their identification, while defendant Zhang provided a driver's license.  The Manager explained that Agriculture Company B gave each of the tour participants a plastic container with seeds for various plants, but nothing about the seeds was considered to be Agriculture Company B's intellectual property.

25.     Company A personnel confirmed to me that defendant Zhang took personal leave on July 17-18, 2013.  Uncharacteristically, defendant Zhang requested that particular leave from work on short notice and provided no details or plans for the leave.  Subsequently, when a Company A supervisor asked defendant Zhang about the leave, defendant Zhang turned visibly red and reported that he did nothing in particular on those days off work but remained in the area.  Company A personnel were unaware that defendant Zhang traveled to the Agriculture Company B facilities in Missouri, and reported defendant Zhang was not there on official Company A business.

26.     The delegation from China also traveled to Stuttgart, Arkansas, while in the United States and visited the Dale Bumpers National Rice Research Center.  On July 22, 2013, FBI agents observed defendant Yan pick up the delegation from China at a Best Western Hotel in Stuttgart, Arkansas, and drive them to the Dale Bumpers Center.  Through his work at the Dale Bumpers Center, defendant Yan had access to the rice varieties stored and studied there—some of the type found in the luggage of the delegation from China, but defendant Yan lacked authority

14

to distribute those seeds to anyone else.

27.     In reviewing emails received from Google, Inc. pursuant to court authorization for defendant Yan's account, I learned that in August 2012, defendants Yan and Zhang traveled to China during the same time to visit the Crop Research Institute, from which part of the delegation from China came.  According to the emails, that trip for defendants Yan and Zhang was coordinated by two of the members of the delegation from China.  An attachment to one of those emails included a photograph taken in China, which depicted defendants Yan and Zhang with those two members of the delegation from China.  After defendant Yan's return to the United States, he thanked one member of the delegation from China for her and her organization's warm hospitality.  Defendant Yan was invited to return to the Crops Research Institute to provide more advice.

28.     In June 2013, defendant Yan received an email from a person at the Crops Research Institute in China that she and another from the Institute, along with others from China, planned to visit the United States in July and August.  She asked defendant Yan to send invitation letters for each of them so they could apply for official passports.  She provided defendant Yan with a list of the individuals, their job titles, and areas of expertise.  Defendant Yan sent these invitation letters on official USDA letterhead and shipped them via Federal Express to China.

29.     Prior to their visit to the United States, a female from the Crops Research Institute in China emailed a presentation to defendant Yan, which a person from the Crops Research Institute would give at the Dale Bumpers Center during the delegation's visit.  Defendant Yan

was identified on slide 54 for his contributions to the Crops Research Institute.  Defendant Yan

asked that the members of the delegation from China not mention to anyone at the Dale Bumpers

Center that he had been to the Institute, and that any reference to him be removed from the

presentation.

   30.     On July 13, 2013, a member of the delegation from China sent an email to

defendant Zhang's Yahoo! email account and to defendant Yan's USDA email account, which

included an itinerary for the delegation's trip to the United States.  An excerpt from a summary

translation of the itinerary is as follows:

- July 16:  Arrive Manhattan, KS airport at 9:10 PM  (Zhang will pick them up from
  the airport and arrange lodging for them)

- July 17:  Tour University of Kansas, meet with a Professor (Zhang will
  accompany them)

- July 18:  Go to St. Louis by car in the morning; visit Agriculture Company B at
  1:00 PM; go to Iowa by car, and stay at a hotel in Iowa (Zhang will accompany
  them)

- July 19:  Tour Agriculture Company C, a seed company, in the morning; visit
  Iowa State University; meet with a Professor; go to Ohio by plane in the evening
  and spend the night at a hotel in Ohio (or stay in Iowa) (Zhang will accompany
  them)

- July 20:  Visit Ohio State University and meet with a Professor; stay at a hotel in
  Ohio

- July 21:  Go to Little Rock, Arkansas by plane; stay at Stuttgart, where U.S. Rice Center is located
- July 22 to July 23:  Visit the rice center, the state university, and the rice farm; meet with Professor Wengui Yan and other scholars

31.     Between July 21 and July 24, 2013, defendant Yan hosted the delegation from China in Stuttgart, Arkansas.  FBI agents observed the Chinese delegation at the Dale Bumpers Center during the morning of July 22, after defendant Yan had picked them up from a Best Western Hotel in Stuttgart.

32.     In a telephone conversation between defendants Yan and Zhang on July 10, 2013, defendant Zhang asked whether defendant Yan still had "Clearfield 121," which was made available in 2002, because defendant Zhang was interested in acquiring such seeds and to conduct research.  Defendant Yan replied that "Clearfield 121" was not listed in the resource library (presumably, the one at the Dale Bumpers Center), and suggested defendant Zhang contact someone in Louisiana.  (We learned from the expert rice geneticist mentioned above that "Clearfield" is proprietary rice variety resistant to herbicides, which is owned by Agriculture Company D.)

33.     In a follow up telephone conversation on July 26, 2013, defendant Zhang told defendant Yan that a member of the delegation from China wanted to obtain materials to do research, but defendant Zhang had already explained to the delegation member that "Clearfield" had been archived and was no longer available.  Defendant Zhang then mentioned that the delegation member had commented someone else from China had been unable to obtain this

17

material after having worked at a particular rice facility for half a year.

34.     FBI agents in Arkansas obtained a search warrant for the imaged USB thumb drive and camera memory cards that Customs and Border Protection personnel found when the seeds were detained.  The digital media contained photographs and video documenting the delegation from China's trip to the United States.  The photographs and/or videos depicted members of the delegation with defendant Yan, as well as members of the delegation with defendant Zhang.

35.     Among the emails provided to me by Company A for defendant Zhang's Company A account, the following were of note:

   a.     Defendant Zhang sent and received emails with a particular account identified on the visa application as an account for one of the Chinese delegation members.  That particular account is with a Chinese email service provider.

   b.     In an email string dated April 3, 2012, defendant Zhang communicated with defendant Yan's Gmail account.  During this exchange, defendant Zhang expressed thanks for the four rice breeding lines defendant Yan had sent to defendant Zhang.  This appeared to be a follow-up to a previous email exchange between defendant Yan and defendant Zhang dated March 9, 2012, in which defendant Zhang expressed his desire to plant four of defendant Yan's breeding lines in Company A's fields that year.

   c.     Defendant Zhang sent Company A confidential or proprietary information to defendant Zhang's personal Yahoo! account in multiple emails.

   d.     In an email dated May 19, 2013, defendant Zhang forwarded an email to

his Hotmail account with a subject line in Chinese characters, which originally was sent

from an email account hosted by a Chinese email provider.  A translation of the email and

attachments provided the following information.  The attachment to the email is titled,

"Housing allowance distribution implementation guide for Hexi District level agencies

and full-time business units."  It was drafted to further a specific urban housing system

reform implementation and notification.  It details who is eligible for the stipend; how the

stipend will be distributed; how much stipend is permitted based on position

classification; how large (square meters) can the housing unit be based on position; what

is the stipend calculation formula; what is the source of the housing stipend; who is

responsible for the housing stipend approval; how will the housing stipend be distributed;

who will verify positions and steps; how will eligibility be verified; what are the

disqualifiers; what is the agency authorized to interpret the regulation; and when will the

regulation take effect.  The attachment further clarifies the regulation concerning

eligibility for the housing stipend; to whom does the policy apply; definition of a non-

house owner; definition of a house owner; housing stipend calculation formula; current

house square meter calculation; ex-military personnel housing; and that the local agency

holds the authority to interpret the policy when special circumstances arise.

   e.  In an email dated December 4, 2013, defendant Zhang sent an email to his

Hotmail account, with the subject line "Summary of rice plants at GH" (likely referring to

green house).  This email discusses rice plants in seven different batches and the "protein

expression analysis" for the samples taken from these plants, which were planted at

19

different stages.  It then lists eight conclusions to be drawn from the different batches and

is signed "Weiqiang" at the bottom.

36.     In the materials associated with defendant Zhang's Company A email account, the

following letter was in the draft email folder.  The letter was in Chinese so was translated nearly

verbatim as follows.

To Agriculture University:

I have worked at the Crops Research Institute researching paddy rice
breeding ever since I received my master's degree in agriculture in 1992. Under
the leadership of the subject matter sponsor, our rice breeds had made great
contribution to the development and production of paddy rice in the area and the
surrounding cities. I was promoted to a mid-level technician in 1994 because of
my excellent work performance, and was again promoted to the position of junior
researcher in 1998, a year before I was eligible for the promotion. After getting
married in 1996, I borrowed or rented my living quarters until I left for my study
in the U.S. in 2000 and have never applied for any housing allocation or subsidy
from the Agriculture University. I am applying for the housing subsidy now since
the University is giving out housing stipend for its employees.

In 2000, I received a scholarship from Kansas State University in the U.S.
to research the application of bio-technology in crops production. My research
primarily focused on the spring and winter wheat's ability to endure cold weather
and the hereditary transformation of this genetic quality. After Kansas State
University, I went to Louisiana State University to pursue my doctoral degree,
majoring in paddy rice genetic and breeding, plant molecule biology, and
molecule marking and breeding. Through merging the lab and field selection
work, I greatly enhanced the selection efficiency of rice herbicide-resistance
genes (chemical mutagenesis), rice plague resistance genes, and gained control of
the genes that dictates rice starch level and gelatinization temperature. I
conducted the first transfer test of the herbicide-resistance genes from the
Clearfield rice to a weed-rice in a producing rice field under the natural
environment. The result of this experiment sets a strong foundation for Louisiana
State University Agriculture Research Center to propose for reasonable, effective
and long-term utilization of the Clearfield technology.

In 2005, I received my doctoral degree in rice heredity and breeding. Until
now, my main research topic is still on developing new rice breeds. All these

years, I worked hard to put into production and practice the knowledge and skills I learned in schools and tried to exchange knowledge in width and depth with scientists and scholars with similar research agenda in order to continuously elevate and perfect my research in science and technology. Although I live abroad, the mother land has always been in my heart. I hope someday to return to the Crops Research Institute and offer all that I have learned without reservation. I often think about what I can do for the research of rice and other crops in our institute under my current circumstance. I try hard to promote scholarly interchange of technology between our researchers and American scholars as well as the scientists from American biotech companies so that we can learn from their advanced technology and use it for our benefit. At present, several famous scholars and breeders from several universities have shown interests in visiting the Crops Research Institute.

In order to maximize the value in scientific research, it has to be able to lead to mass production.  The research, development, and utilization of rice related products do not have to be limited to seeds and commodity grain. Rice seeds can be used as a carrier to produce protein products by introducing external genes, an agent to widen the advanced research in application of grain seeds to produce enzyme for industrial, medical, health care and make-up products with specific purposes. It can also be used to grow recombinant protein to develop commercial products. With respect to the unit of land area, the protein industry products have generated income which is 500 times greater than the income generated by the commodity grains.  The company I work for is the only biotech company in the U.S. that has the ability to produce and sell recombinant protein products from growing rice seeds. I hope in the near future, Tianjin, China will have the same capability in this kind of research and development in biology.

Respectfully yours,

ZHANG Weiqiang

Oct. 17, 2010

37.      In a somewhat similar vein, in November 2012, defendant Yan wrote a report titled, "2012 YAN Wengui's Activities in Serving the Nation."  In this report, defendant Yan listed several activities including: provide rice research breeds accelerating China's science research; recommend the U.S. science technology to accelerate Chinese agricultural science

research and faster development in modernizing production; returning to the country [China] to proceed science and technology exchange, research cooperation, and assist Chinese professors advising research students; and to train talents for the Chinese agricultural science and technology.

38.     During an interview with FBI agents on December 10, 2013, defendant Yan told them he had helped arrange the trip for the delegation from China this past summer and had hosted them during part of their trip in Arkansas.  He also told the agents that defendant Zhang had assisted with arranging the trip for the delegation and that defendant Zhang also hosted them during part of their trip to the United States.  He acknowledged the trip to the Crop Research Institute in China in 2012 occurred at the same time defendant Zhang was also there, but claimed his travel to the Institute was only a side-trip from his visit to his home and family in Sichuan. However, the emails referenced above made it abundantly clear that the trip to the Institute for both defendants Yan and Zhang were arranged together by Institute personnel.  Additionally, the geographic distance between the Institute's location and Sichuan is significant, so defendant Yan's "side-trip" for such a distance is not likely.

39.     In that same interview, defendant Yan reported he did not know the name of the company for whom defendant Zhang worked and claimed to not know exactly what defendant Zhang did for the company because it was rather "secretive."  He also denied ever discussing "Clearfield" seeds with defendant Zhang.  However, in another interview with the same FBI agents on December 11, 2013, after listening to his conversations with defendant Zhang, he finally admitted discussing the "Clearfield" seeds.  During the interview on December 11, 2013,

defendant Yan also admitted forging his supervisor's name on official documents because defendant Yan believed the supervisor would not have approved the documents.

40.     On December 11, 2013, FBI agents served a search warrant at defendant Zhang's residence in Kansas.  In the master bedroom closet, agents found a small manila envelope with suspected agricultural seeds.  Around the same time as that discovery, agents asked defendant Zhang's wife if any seeds were in the home.  She told the agents her husband had seeds in the refrigerator.  The agents found suspected agricultural seeds inside multiple small manila envelopes within two sealed Ziploc bags in the freezer.  When asked about the seeds found in his freezer, defendant Zhang told me that they were three different types of agricultural seeds, two of which are only produced by Company A, and match the two types of agricultural seeds found on the delegation from China by Customs and Border Protection personnel.

41.     Also, on December 11, 2013, I interviewed defendant Zhang who told me that he assisted with arranging the travel for the delegation from China and spent time with them during their visit.  Defendant Zhang denied he gave any agricultural seeds to the delegation from China this past summer, and he also denied taking any members of the delegation to Company A's facility in Kansas.  Defendant Zhang was at a loss to explain to me how the delegation from China came into possession of agricultural seeds produced only by Company A.  Before the seeds were found in defendant Zhang's residence, I specifically asked him if any seeds would be found there, and he replied none were there.  Yet, as noted above, once the seeds were found, he told me that he had harvested them from Company A's plants in Kansas in approximately October 2012 when he was at the field by himself and took the seeds to his home for "private research"

23

purposes.

42.    I respectfully request the issuance of arrest warrants for defendants Weiqiang

Zhang and Wengui Yan for conspiracy to steal trade secrets in violation of Title 18, United States

Code, Section 1832(a)(5).

_____
Charles W. Campbell
Special Agent, FBI


Sworn to before me and subscribed in my presence this 12th day of December, 2013, at

Kansas City, Kansas.

_____
HONORABLE JAMES P. O'HARA
UNITED STATES MAGISTRATE JUDGE
District of Kansas

Penalties:

Ct. 1:   NMT 10 years imprisonment; NMT $250,000 fine; NMT 3 years supervised release; $100 special assessment